HENRY L. WILSON, trustee,

*·v.*

FREDERICK WEIGLE and ERNEST A. ROSE.

[Submitted September 1st, 1905. Decided September 22d, 1905.]

1. Under the Bankrupt act of July 1st, 1898, chapter 541, section 60b, (*30 Stat. p. 562; U. S. Comp. Stat. 1901 p. 3445*), providing that if a bankrupt shall have given a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value, the party receiving payment must have had reasonable ground to believe that it was intended thereby to give a preference before he can be held liable to refund.

2. In an action by a trustee in bankruptcy to recover a payment made by the bankrupt, on the ground that it was an unlawful preference, evidence *held* insufficient to show that defendants had reasonable ground to believe that a preference was intended.

---

On final hearing on bill, answer and proofs.

*Mr. Frank Benjamin,* for the complainant.

*Mr. Egbert J. Tamblyn,* for the defendants.

36

PITNEY, V. C.

The complainant, Wilson, is trustee in bankruptcy of David Freedman, a bankrupt, of Chicago, Illinois, a dealer in jewelry.

The defendants, Weigle & Rose, are manufacturing jewelers of Newark, New Jersey, and prior to February 11th, 1904, were creditors of Freedman in three several promissory notes maturing on the 10th, 15th and 20th of January, 1904, and which were protested for non-payment, and on the 29th of January amounted, with protest fees and interest, to $511.71.

On the 3d of February, 1904, they settled with Freedman and accepted from him $200, a trifle less than forty cents on a dollar, and gave a receipt in full for their claims.

On the 7th of March involuntary bankrupt proceedings were instituted against Freedman. On the 22d of March he was duly adjudicated a bankrupt. On the 29th of April the complainant was appointed his trustee in bankruptcy, and on the 2d of May, having given his bond, was authorized to act as such, and took possession of the bankruptcy estate.

He now files his bill in this court to recover back the payment of $200 so made by Freedman to the defendants, on the ground that it was an unlawful preference.

The special allegation of the bill on that behalf is this: That on or before February 3d, 1904, Freedman was insolvent, and that his liabilities amounted to $6,800 and his assets to $2,000, which rendered him insolvent, and the defendants had due notice of it; that the assets in hand at the time of filing the bill, January 11th, 1905, were only about $400.

The facts which are admitted, or which clearly appear in evidence so as not to be open to dispute, are as follows:

Previous to the month of January, 1904, Freedman was doing business as a dealer in jewelry in a room in the Masonic Temple in the city of Chicago. He had a safe, showcase, desk and all the implements necessary for his business, and was undoubtedly solvent.

He kept regular books of account, about the accuracy of which no serious dispute was made. They showed his indebtedness with substantial accuracy, and also the amount due him from his debtors.

An important item of fact is that the character of goods in which he mainly dealt was what is known as staple goods, consisting mainly of gold rings and gold chains.

The evidence is quite clear that for some time previously he had been arranging with his creditors in such manner that his indebtedness had taken largely the shape of promissory notes falling due in January, 1904.

He swears, when called by complainant as a witness, that on the morning of the 6th of January he had on hand over $3,300 cash in his safe.

Mr. Rose, the defendant, who examined his books of account with care about the first of February, swears that his cash-book showed that he should have had on hand at that time the amount of cash which he claimed to have and swore in this cause that he did actually have.

On that day, January 6th, 1904, he claimed to have been forcibly robbed of about $3,400 in cash, $141 in a check of a customer not yet deposited and $500 or $600 of merchandise, making a loss by robbery in round figures of $4,100.

On the 9th of January he caused to be prepared and mailed to his creditors a letter stating these facts and showing his present financial condition. By that he showed that his assets on that day were:

| | |
|---|---:|
| Cash on hand | $810 00 |
| Stock on hand | 1,950 00 |
| Fixtures and safe | 150 00 |
| Book accounts (both good and doubtful) | 2,265 00 |
| | $5,175 00 |

If we add to this the alleged losses by robbery, $4,100, we have $9,275.

In the same letter he states his liabilities at $6,780, showing an ability, if his remaining assets were good, as stated, to pay seventy-six cents on a dollar. He swears that his book accounts were worth at least seventy-five cents on the dollar, which would leave him able to pay seventy cents on a dollar.

Mr. Rose, shortly after receiving this letter, started out on a

business trip, which brought him to Chicago toward the latter part of the month, when he set about looking into Mr. Freedman's affairs in a thorough and business-like manner. He first heard his story about the robbery and that of the witnesses.

He had, in addition, read a second letter, written by Mr. Freedman to his creditors under date of January 14th, giving a detailed account of how he happened to have so much money on hand, and also the details of the robbery. This letter had reached the firm after Mr. Rose started out on his trip and had been forwarded to him at Chicago.

He then conferred with the police officials, with the result that he became satisfied that there had been no robbery, and he found the police officials, and all who had made any investigation of the affair, were of that opinion.

He then examined into his actual financial condition and means. He took his word that he had on hand in cash, on the day the letter was written, the sum of $810. He found satisfactory evidence that he had paid out some money since the 9th of January in settling with some of his creditors and in living expenses.

He examined his stock of goods, made a careful inventory of them—which is produced—found them to consist mainly of rings and chains (with the value of which he was familiar because he manufactured them) and appraised them at $1,911.50, nearly the amount which Freedman claimed them to be worth in his circular. He found the fixtures and safe to be worth what Freedman claimed—$150.

He then examined the credits on his ledger; he had a list of those credits furnished him by Freedman which amounted to $2,265, and with the aid of his counsel went over Freedman's ledger and checked them off, and found the charges all there, and saw no reason to doubt that they represented an actual indebtedness as therein stated. He therefore concluded that his statement in the circular letter of his assets was substantially correct, and that taking the value of the establishment as a going concern it was worth about $5,000, which would enable Freedman to pay seventy cents on the dollar or thereabouts.

He also learned that the man Rosenfeld, who appears to have prepared the circular letter of January 9th, proposed to go into business with Freedman.

I should have stated that he found Freedman in complete control of the premises, and apparently doing business as if nothing had happened.

He also learned from Freedman that after conferring with his friendly creditors he had made up his mind to try to settle with his creditors at forty cents on the dollar; that he had already settled with some of them at that rate, and had made arrangements to raise money to settle with the rest on the same basis. Naturally, Rose, believing as he did that Freedman had within his control over $3,000 in cash of which he had pretended to have been robbed, did not feel any mistrust of his ability to raise the money to make the settlement, but he did inquire carefully into the probability of his being able to settle with all his creditors on those terms, and received from Freedman satisfactory assurances and information on that subject.

Though he does not say so in so many words, I cannot but think, from a reading of the whole testimony, that he felt that Freedman would be willing to pay more than forty cents if it were necessary so to do in order to settle.

He finally concluded to accept the forty cents and gave a receipt accordingly.

There is no proof before me as to what disposition was made by Freedman of his assets between February 3d, 1904, and May 2d, 1904, when the trustee took possession, nor as to the character of the assets which the trustee took into his possession. An *ex parte* affidavit made by the trustee on the 3d of July, 1905, states that the appraised value of the assets coming into his possession was $1,962.15, and that the amount of assets then on hand, July 3d, 1905, was $184.11, over $200 less than the amount in hand when the bill was filed January 11th.

The parties in this settlement were entirely at arms'-length. There is nothing to warrant the inference that Freedman intended to treat the defendants better than he at that time intended to treat his other creditors. The clear weight of the

evidence is that he was financially able at that time to have settled with all his creditors upon the same terms, and so far as appears he was then quite willing to do so. There is nothing to explain his not doing so except the inference that some of those creditors refused to accept his offer.

Upon these facts the question is whether, under the bankrupt laws of the United States, the defendants should refund the $200 received by them in full of their claim of $511 on the 3d of February, 1904.

The object of the Bankrupt law is to produce an equal distribution among his creditors of the assets of the insolvent, and to that end they provide against unlawful preferences made by the insolvent in anticipation of bankruptcy, and for a recovery back by the trustee in bankruptcy of any unlawful preferences made within a certain period of the bankruptcy.

Undoubtedly Freedman was insolvent in the sense in which that word is used in the Bankrupt act at the time he paid the money to Rose, because he did not have sufficient assets over and above those which Rose believed he had concealed to pay his debts in full.

The first section of the act declares that a person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts.

Rose dealt with him as an insolvent, but he did not consciously accept the payment as a preference. I find as a fact that Rose thoroughly believed that Freedman was able and willing out of his unconcealed assets to pay each of his creditors considerably more than the forty cents on the dollar which he offered, and that he would if pressed pay more than that, and that Rose had no reason to believe but that every creditor would be able to receive, if he chose to accept it, the same rate of payment which he received on behalf of the defendants.

Further, there is nothing in the case to indicate that Freed-

man intended to prefer Rose over his other creditors or supposed that he was doing so, so that the element of intentional or conscious preference of one creditor over another nowhere appears in the case up to the moment of the settlement with Rose. Further, there is no reason to believe that at that time Freedman did not intend in good faith, and was not able to settle with all his creditors at the rate mentioned. What may have been conceived and accomplished by him in the way of making further fraudulent disposition of his assets between February 3d and March 7th, when he found that all his creditors would not settle on these terms, there is nothing to show. No proof was offered by complainant on that topic, for, as before remarked, the character of the assets which came to the hands of the trustee on the 2d of May has not been shown, nor has he shown what efforts he made, if any, to find other assets or to ascertain what had become of those which undoubtedly existed on the 3d of February.

Turning now to the statute we find the provisions governing the transaction as follows:

"a. A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required.

"b. If a bankrupt shall have given a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, *shall have had reasonable cause to believe* that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person. And, for the purpose of such recovery, any court of bankruptcy, as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction."

It appears by this legislation that the party receiving the payment must have had reasonable ground to believe that it was

intended thereby to give a preference before he can be held liable to refund. The actual intention to give a preference on the part of the insolvent is a necessary ingredient and the creditor receiving it must have reasonable cause to believe in the existence of such intent. .

Counsel for complainant does not contend in his ingenious argument that there is any evidence in the case to warrant the existence of such intent, or to warrant the inference that Mr. Rose or either of the defendants' had reasonable cause to believe that Freedman intended to give the defendants a preference over his other creditors or to show them any special favor.

He boldly argues that every creditor of an insolvent debtor has a right by the statute to have his estate administered in the bankrupt court, and that a party who accepts a composition from an insolvent takes it with notice of that right on the part of the other creditors, and that no matter how fair the offer is, and how willing and able the debtor is to make it, yet if any one of the creditors shall decline to accept it and throw the debtor into bankruptcy, and after the waste and wear and tear of a winding-up in bankruptcy, the estate shall not pay as much to the non-assenting creditors as the debtor paid to those who did assent, the creditors who accepted the composition will be liable to refund. In other words, he construes the mere fact that the debtor is compounding with his creditors at a fair rate is evidence "that it was intended thereby to give a preference."

I am unable to follow that reasoning or adopt that construction. It seems to me that it necessarily involves a plain perversion of the clear meaning of the statute.

One thought in that connection may be worth mentioning. An actual preference is fatal if made within four months of filing the petition in bankruptcy. A settlement with creditors may have been perfectly fair when offered, and may have been accepted by several of them, and before all of them have had the opportunity to consider it, and then, before the lapse of four months, misfortunes may have overtaken the insolvent, and the means which he had carefully preserved for the purpose of carrying through his original plan of settlement may ·

have been swept away through no fault of his. Nevertheless, according to the complainant's argument, all the creditors who had accepted would be compelled to refund.

Several cases were cited by the complainant's counsel which were decided under the previous Bankrupt act of 1867. The controlling language of those acts is different from that of the present act in stating the description of a debtor who is liable to be thrown into bankruptcy. The part of the act of 1867 controlling the present question is as follows:

"or who, being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency, shall make any payment, gift, grant, sale, conveyance or transfer of money or other property, estates, rights or credits, or confess judgment, or give any warrant to confess judgment, or procure his property to be taken on legal process, with intent to give a preference to one or more of his creditors."

And the liability of the creditor to refund is expressed as follows:

"And if such person shall be adjudged a bankrupt, the assignee may recover back the money or property so paid, conveyed, sold, assigned or transferred contrary to this act; *provided,* that the person receiving such payment or conveyance had reasonable cause to believe that the debtor was insolvent and knew that a fraud on this act was intended."

One case relied upon by complainant is *In re Hapgood et al., 2 Low. 200; 7 Am. L. Rev. 664,* decided by Justice Lowell in 1873. That was a petition by a dissatisfied creditor to throw the insolvents into bankruptcy after they had settled with the great majority of their creditors at fifty cents on the dollar and had assets enough left to pay the non-accepting creditors in full, and a handsome surplus. The reliance of the petitioners was upon the bare act of compounding with their creditors and paying them a percentage without the consent of every one of them. Judge Lowell held that there had been no act of bankruptcy. Some of his language and argumentative propositions may be construed as favoring the complainant's position, but, taken as a whole, the opinion does not seem to me to help the complainant.

The headnote in Lowell's reports is this:

"Payment by an insolvent debtor of a percentage on claims of a part of his creditors which does not lessen the percentage which the other creditors will receive is not a preference."

Another case cited is *Hackney* v. *Raymond, 10 Am. Bankr. Rep. 213.* The governing principle found in the headnote is as follows:

"The trustee in bankruptcy may recover money paid by the bankrupt as a preference only when the person receiving it had reasonable ground to believe that a preference was intended.

"If the creditor has reasonable ground to believe that the debtor is insolvent, and the obvious effect of receipt of the money under those circumstances is to give him an advantage over other creditors, he is chargeable with notice of intent to prefer.

"Whether a creditor had reasonable cause to believe his debtor insolvent, within the purview of section 60, is a question of fact."

If this be an accurate statement of the law it is fatal to complainant's argument.

I have examined most of the cases cited by counsel for complainant and find none which go far enough to warrant a recovery in this case, and so therefore advise a decree for defendants.